IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| STEVEN PEREZ | § | |
|     TDCJ-CID NO. 1514617 | § | |
| v. | § | C.A. NO. C-10-297 |
| | § | |
| RICK THALER | § | |

**MEMORANDUM AND RECOMMENDATION TO
GRANT RESPONDENT'S MOTION FOR SUMMARY JUDGMENT**

Petitioner is a state prisoner currently incarcerated at the Connally Unit in Kenedy, Texas.
On September 10, 2010, Petitioner filed this pro se habeas corpus petition pursuant to 28 U.S.C.
§ 2254, challenging his conviction on a host of different grounds.  (D.E. 1).[1]  Pending is
Respondent's motion for summary judgment.  (D.E. 30).  Petitioner filed a response on January 13,
2011.  (D.E. 33).  For the reasons stated herein, it is respectfully recommended that Respondent's
motion for summary judgment be granted, and that this habeas petition be dismissed.

**I.  JURISDICTION**

The Court has jurisdiction over the subject matter and the parties pursuant to 28 U.S.C.
§§ 2241, 2254, which provide that jurisdiction is proper where the inmate is confined, or where the
conviction was obtained.  Wadsworth v. Johnson, 235 F.3d 959, 961-62 (5th Cir. 2002).  Petitioner
was convicted in Nueces County, Texas.  (D.E. 22-1, at 75).  Jurisdiction is, therefore, proper in this
Court.  28 U.S.C. § 124(b)(6).

---

[1] Petitioner also filed two amended petitions, (D.E. 37, 38), that are fully considered within this memorandum and
recommendation.

## II.  BACKGROUND

**A.     Factual Background.**

**1.      Pretrial.**

Petitioner pled guilty to possession of cocaine with intent to distribute and was convicted in this Court on February 16, 2004.  United States v. Perez, C-03-278 (S.D. Tex.), at (D.E. 17, at 1).[2] He was sentenced to a term of twenty-seven months in federal prison.  Id. at 2.

On December 2, 2006, while Petitioner was out of federal prison on supervised release, Riko Rodriguez was shot and killed at an apartment belonging to his friend, Roy De Los Santos, Jr., in Corpus Christi, Texas.  Gonzalez v. Thaler, C-10-069 (S.D. Tex.), at (D.E. 4, at 108).  On December 4, 2006, Petitioner was interviewed by Detective Ralph Lee with the Corpus Christi Police Department.  (D.E. 22-20, at 16).  The interview was conducted in the presence of Petitioner's counsel at the time, Ken Botary.  Id.  On January 11, 2007, Petitioner was arrested pursuant to a warrant for the murder.  (D.E. 22-16, at 11-13; D.E. 22-22, at 63).  On January 12, 2007, through counsel, he filed an application for a pretrial writ of habeas corpus, arguing that he was being confined illegally because no indictment had been filed charging him with murder, no hearing afforded to him, no charges presented to him, and an excessive bond imposed on him.  (D.E. 22-16, at 16-17).  He requested that a hearing be held to consider his motion.  Id. at 20.  The hearing did not take place for unclear reasons; the trial court later suggested that Mr. Botary canceled it.  (D.E. 22-20, at 21).

On January 18, 2007, Detective Lee interviewed Petitioner again, this time with no counsel

---

2 Because Petitioner and his cousin and co-defendant David Gonzalez have filed numerous actions relevant to the disposition of this petition, there will be references to several other cases.  They will be cited by their full names. Where a citation includes only a docket entry, and no case name, it refers to the docket in this action.

present.  Id. at 16.  At this interview, he gave a videotaped statement confessing that he went to Mr. De Los Santos' apartment, where Mr. Rodriguez and Iris Perez, his ex-wife and the mother of his child, were staying.  Id. at 18.  He went with his cousin, David Gonzalez, and a third man, Michael Lozano.  Id.  According to Petitioner's account, they obtained a pistol en route to their destination, and Mr. Lozano unexpectedly pulled it out and fired shots through the closed front door without provocation or warning.  Id.  At the end of that interview, he asked for an attorney because his own had withdrawn due to lack of payment.  Id.  On January 19, 2007, the trial court appointed Petitioner a new attorney.  (D.E. 22-16, at 22-23).

On March 28, 2008, the trial court granted a Brady[3] motion filed by Petitioner's counsel demanding that the prosecution produce any exculpatory evidence.  Id. at 47-50.  Furthermore, prior to trial, Petitioner's counsel also moved for the suppression of the incriminating videotape statement, arguing that law enforcement violated his client's constitutional rights in failing to sufficiently ascertain whether he was represented and whether he desired counsel to be present.  (D.E. 22-20, at 21).  On March 28, 2008, the trial court conducted a hearing into the circumstances surrounding the statement.  Id. at 15.  Defense counsel presented evidence that Petitioner's previous attorney had counseled him not to speak to law enforcement without an attorney present.  Id. at 19.  The prosecution responded that Petitioner was unrepresented at the time, that he himself initiated the interview, and that he failed to unambiguously invoke his right to remain silent or his right to have an attorney present.  Id. at 22.  After reviewing the tape and considering the evidence, the trial judge found that Petitioner had reinitiated the interview and failed to invoke his right to stop it; she therefore denied the motion to suppress.  Id. at 24.

---

3  Brady v. Maryland, 373 U.S. 83 (1963).

On April 2, 2008, after a jury trial, Mr. Lozano was found guilty of murdering Mr. Rodriguez and sentenced to seventy-five years.  Brief for Appellant at *2, <u>Lozano v. State</u>, No. 13-08-180-CR, 2010 WL 1179848 (Tex. App. Apr. 8, 2009).

### 2.    Trial.

Voir dire in Petitioner's trial began on April 7, 2008.  (D.E. 22-21, at 14).  At the beginning of the court session, Petitioner's counsel related to the court that he wanted to subpoena Eric Flores, Mr. Lozano's former cell-mate and a prosecution witness in his trial, to testify, but that he had received no cooperation from the state probation office and had been unable to serve him.  <u>Id.</u>  Mr. Flores was apparently on the prosecution's witness list, but had not been subpoenaed by the prosecution.  <u>Id.</u>  The court offered to speak to Mr. Flores' probation officer to facilitate service. <u>Id.</u>  At a later time, during a break in the prosecution's case, defense counsel renewed his complaint that he had not been able to track down Mr. Flores and the court again promised to assist in the effort.  (D.E. 22-22, at 63).  Defense counsel subsequently indicated that both he and the prosecution believed that Mr. Flores had "experienced some type of retaliation for his participation in this case" and had gone into hiding.  (D.E. 22-23, at 5).  The prosecutor mentioned that he too had been seeking Mr. Flores to no avail.  <u>Id.</u>  He indicated to the court that "because the witness essentially is unavailable, I think we need to accommodate" the defense in some way, offering to present Mr. Flores' previous statements to the jury in another form.  <u>Id.</u>

The guilt or innocence phase of the trial began on April 8, 2008.  (D.E. 22-22, at 6).  During opening statements, defense counsel posited that "most of the facts in this case won't be in dispute." <u>Id.</u> at 13.  He asserted that the main issue in the trial was whether Mr. Lozano "committed an independent act which Steve Perez wouldn't be guilty of."  <u>Id.</u>

The prosecution called Benny Asberry as one of its first witnesses. Id. at 15. He testified that he was living next to Mr. De Los Santos' apartment at the time of the shooting, and that he heard a knocking on the adjoining apartment's door and shots shortly thereafter. Id. at 16. Mr. Asberry suggested that the victim had called out to the defendants before he was killed. Id. He further testified that he looked out of his door following the gunshots and observed Petitioner running from the apartment. Id. Finally, Mr. Asberry mentioned that Petitioner had threatened the victim after an altercation between the two men earlier that week. Id. at 17. Defense counsel conducted a lengthy cross-examination designed to cast doubt on his reliability and his version of events. Id. at 19-23, 25-29.

Early in the trial, a juror realized that she worked at the same organization as the victim's sister. Id. at 23. The court called her to the bench for questioning, where she represented that she did not work in the same office or the same building as the sister, that neither had supervisory authority over the other, and that they socialized approximately once a month. Id. at 23-24. She swore that she could serve as a fair and impartial juror. Id. at 24. Defense counsel acknowledged that his voir dire questioning would not have elicited this information, but moved to replace her with an alternate. Id. The trial judge denied the motion. Id. at 25.

On the second day of trial, Iris Perez was called by the prosecution. (D.E. 22-23, at 8). She testified that she saw Mr. Lozano outside the apartment right before the shooting, and observed Petitioner running away from it before the shots were fired. Id. at 16-17. When asked by the prosecution whether she had said to Detective Lee in a phone call that she blamed Petitioner for the shooting, Ms. Perez denied it. Id. at 24. She declined an opportunity to review the conversation to refresh her recollection. Id. The prosecution sought to admit a recording of the phone conversation

and it was allowed over an objection by defense counsel that the prosecutor had not followed the proper protocol for refreshing her recollection.  Id. at 24-25.  A recording of the conversation was played for the jury.  Id. at 25.  After it was played, defense counsel objected to portions of it that contained hearsay within hearsay and noted that he had not been provided with a recording prior to trial.  Id.  The prosecution denied that it had not been provided during discovery, and defense counsel replied that it was an oversight on their part not to supply it, and an oversight on his not to request it.  Id. at 29-30.  Defense counsel later objected that the recording also contained inadmissible references to previous criminal charges against Petitioner.  Id. at 29.

In defense counsel's cross-examination of Ms. Perez, he focused on undermining the plausibility of Petitioner's motive for committing the crime and emphasizing Mr. Lozano's more central involvement in the shooting.  Id. at 31-33.  In addition, he sought to elicit testimony suggesting that Mr. Lozano could not have been aware that anyone was directly behind the door when he fired the fatal shots.  Id. at 35.

While Detective Lee was on the stand, the prosecution sought to admit the incriminating videotaped statement by Petitioner.  Id. at 50.  Defense counsel re-urged his pretrial objections on Fifth and Sixth Amendment grounds and was overruled.  Id.  During defense counsel's cross-examination of Detective Lee, he underscored the fact that nearly every account pointed to Mr. Lozano as the shooter rather than Petitioner, and suggested that Mr. Lozano had as much, if not more, of a grudge against the victim as did Petitioner.  Id. at 54, 57.  He also attempted to garner testimony to bolster his argument that the incriminating videotaped statement had been given under questionable circumstances and that Petitioner's rights to counsel and against compelled self-incrimination had not fully been honored.  Id. at 55-56.  Finally, defense counsel broached with

Detective Lee the subject of Mr. Flores, highlighting the fact that he too had fingered Mr. Lozano as the shooter, and suggesting that his incriminating statements regarding Mr. Perez's involvement in the incident may have resulted from a deal offered by the prosecution.  Id. at 56; (D.E. 22-24, at 18).

Throughout the prosecution's case, multiple witnesses testified regarding animosity between Petitioner and the victim stemming from the latter's relationship with Ms. Perez.  See, e.g., (D.E. 22-22, at 33; D.E. 22-23, at 11-13).  Several spoke in particular about the recent altercation between the two that preceded the shooting.  See, e.g., (D.E. 22-22, at 33).  Mr. De Los Santos testified that the victim had remarked after the altercation that Petitioner and his friends "were gonna come back to get" him.  Id. at 36.

When the prosecution rested its case, defense counsel moved for a directed verdict of not guilty on the murder charge and asked that the trial proceed only on manslaughter.  (D.E. 22-24, at 23).  He argued that there had been no evidence to prove beyond a reasonable doubt that either Mr. Lozano or Petitioner "were acting with the requisite intent to cause death or ... serious bodily injury because all the testimony in this case has been consistent that ... there was no way that the persons outside could have known that individuals were inside the apartment."  Id.  The prosecution responded by citing evidence to the contrary, including the running conflict between Petitioner and the victim, the supposed threats he had made, the obtaining of the weapon, and the evidence that the victim may have spoken from behind the door, thus alerting Mr. Lozano to his location.  Id.  The court denied the motion.  Id. at 24.

Defense counsel called two witnesses.  Id. at 24-29.  The first was a friend of Ms. Perez, who testified that Petitioner did not threaten the victim after their altercation, and the second was Mr. Botary, who testified about the circumstances surrounding Petitioner's incriminating statement to

police.  Id. at 25, 28.  With the consent of the prosecution, defense counsel then played for the jury

Mr. Flores' videotaped statement to police, because neither party had been able to locate and

subpoena him to appear at trial.  Id. at 29.

After resting the case, defense counsel re-urged his motion for a directed verdict of not guilty

on the murder charge.  Id. at 30.  The court again denied the motion.  Id.  When the discussion

turned to the jury charges, the prosecution asked the court to omit any lesser included charge of

reckless manslaughter.  Id.  Defense counsel responded that there was evidence indicating that the

defendants did not know whether anyone was inside the apartment, and that the shooting was

therefore at most a reckless act.  Id. at 31.  The court struggled with the question, remarking:

> I think where my hang up is ... [i]t's the issue of knowingly.  It is the
> definition of knowingly that makes ... it less likely that the only thing
> the jury would convict your client of is the lesser included [charge]
> of manslaughter.   Because the definition of knowingly is ...
> [s]ubstantial risk of harm and of gross deviation.  Anyone shooting
> at an apartment at 5:30 in the morning when people are asleep to me
> takes it out of the reckless category and takes it into the knowingly
> category.

Id.  In response, defense counsel suggested that the judge was misconstruing the burden of proof

insofar as she appeared to expect the defense to present evidence that Petitioner knew no one was

in the house, when it was the prosecution's burden to prove that Petitioner had reason to believe

anyone was in the house.  Id. at 32.

A lengthy debate between the attorneys ensued regarding lesser included offenses generally,

whether there was evidence that Petitioner intended death or harm to come to Mr. Rodriguez, and

whether Mr. Lozano knew there were people in the apartment into which he was shooting.  Id. at

33.  After both sides exchanged their views, the court decided to omit manslaughter from the jury

charge as a lesser included offense, stressing that the individuals involved had "put in motion a

series of events that ended in the death of somebody." <u>Id.</u>  She observed that she could not "get off the fact of knowingly" and that if she were mistaken "then the court of appeals is gonna tell me." <u>Id.</u>  The court likewise denied defense counsel's motion to include a jury charge regarding independent impulse. <u>Id.</u> at 34.  However, after a recess, the judge reversed her ruling on the lesser included offense of manslaughter, noting that she had been "placing weight and value on the evidence on which I should not have done." <u>Id.</u> at 35.

At closing argument in Petitioner's trial, the prosecutor stated to the jury that "[t]he only question is, is he guilty or not guilty of murder." <u>Id.</u> at 40.  He told the jurors that there are "two ways of committing murder" and that "[y]ou don't have to tell us which way you think it happened. We don't have to prove which way it happened." <u>Id.</u>  The prosecution described Mr. Asberry as "the only person who doesn't have a dog in this fight, nothing to gain or lose" and emphasized that he had come against his will and was fearful of Mr. Lozano and Petitioner.  <u>Id.</u> at 44.

During closing argument, defense counsel reiterated that many of the facts were not in dispute, but emphasized that Mr. Lozano had acted recklessly, not with intent or knowledge, and that he shot the gun as an independent act, without any encouragement or complicity from–or knowledge by–Petitioner. <u>Id.</u> at 42-45.  He also criticized Mr. Asberry's credibility as a witness, and attempted to downplay various aspects of the trial that had portrayed his client in an unflattering light. <u>Id.</u>  In rebuttal, the prosecutor responded that Petitioner had been part of a plan to inflict harm upon the victim. <u>Id.</u> at 45-47.

After closing arguments, the jury retired to deliberate with instructions that read in part: "a person commits the offense of murder if he intentionally or knowingly causes the death of an individual, or intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual." (D.E. 22-1, at 95).  The instructions further informed

9

the jurors "that a person commits the offense of manslaughter if he recklessly causes the death of an individual." Id. Intentional conduct was defined as that which causes a result with a "conscious objective or desire." Id. at 96. Knowing conduct was distinguished as that undertaken with "aware[ness] that [one's] conduct is reasonably certain to cause the result." Id. Finally, reckless conduct was described as occurring when a person "consciously disregards a substantial and unjustifiable risk that the result will occur" where "[t]he risk [is of] such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise." Id.

The instructions explained the standard of reasonable doubt and instructed the jury on the lesser included offense of manslaughter. Id. at 97-98. In addition, the jury charge counseled that if a juror "should find from the evidence beyond a reasonable doubt that the defendant is guilty of Murder or Manslaughter, but you have a reasonable doubt as to which offense he is guilty, then you should ... find the defendant guilty of the lesser-included offense of Manslaughter." Id. at 99.

The jury instructions also contained a summary of the law of parties in Texas, providing that:

> All persons are parties to an offense who are guilty of acting together in the commission of an offense. A person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or both.... Each party to an offense may be charged with the commission of the offense.... A person is criminally responsible for an offense committed by the conduct of another if, acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense.

Id. The charge concluded that Petitioner could be convicted of murder or manslaughter under the law of parties if his conduct fit the relevant definition. Id. at 100-01.

The jurors were cautioned, in a lengthy section making specific reference to Petitioner's exchanges with Detective Lee, not to rely upon any statements made by Petitioner that they did not believe were given freely, voluntarily, and with knowledge of his right against compelled self-incrimination.  Id. at 101-03.  Finally, the instructions closed with a description of the presumption of innocence and the burden of proof, as well as a reminder that they were the "exclusive judges ... of the credibility of the witnesses, and of the weight to be given the testimony."  Id. at 106.

On April 14, 2008, Petitioner was found guilty of first-degree murder and exhibiting a deadly weapon.  Id. at 75, 109-10, 116; (D.E. 22-24, at 48).

That same day, the punishment phase of the trial began.  (D.E. 22-25, at 5).  Petitioner entered a plea of true to an enhancement allegation regarding his prior federal conviction for possession of cocaine with intent to distribute.  Id.  In his opening statement at sentencing, defense counsel urged the jury to have compassion for Petitioner.  Id. at 6.  He then called several witnesses to testify to his good character, including Petitioner himself.  Id. at 7-19.  In his closing statement, he suggested that a sentence of twenty years would be an appropriate punishment given his client's character, family, and history.  Id. at 23.  In the prosecutor's closing statement, he noted that there was "a component of Dr. Jekyll and Mr. Hyde" to Petitioner, that he had "not repented at all," and that he therefore deserved a severe penalty.  Id.  On April 14, 2008, the jury sentenced Petitioner to sixty years incarceration and a fine of $10,000.  Id. at 25; (D.E. 22-16, at 114).

 On May 9, 2008, Mr. Gonzalez pled guilty to being a felon in possession of a firearm and manslaughter as a felony offender.  Gonzalez v. Thaler, C-10-069 (S.D. Tex.), at (D.E. 4, at 35; D.E. 26-1, at 37-38).  He was convicted on the same day and sentenced to thirteen years incarceration.  Id. at (D.E. 4, at 42; D.E. 26-4, at 112).

On July 22, 2008, Petitioner was found by this Court to have violated the terms of his federal

supervised release by committing murder and various other violations.  <u>United States v. Perez</u>, CR-03-278 (S.D. Tex.), at (D.E. 36, at 1-2).  He was sentenced to twenty-four months of federal incarceration, to be served consecutive to his state prison term.  <u>Id.</u> at 3.

## B.  Procedural Background.

Petitioner appealed his conviction to the Texas Thirteenth Court of Appeals on October 7, 2008.  (D.E. 22-4).  He argued, through counsel, that a juror had been seated inappropriately, that the prosecution improperly impeached its own witness, that an inadmissible statement made by Petitioner while under arrest had been entered into evidence, that the jury should have been instructed on the theory of independent impulse, and that the evidence was insufficient to support the verdict.  <u>Id.</u> at 8-9.

The appellate court affirmed the conviction.  <u>Perez v. State</u>, No. 13-08-296-CR, 2009 WL 1607811 (Tex. App. Feb. 26, 2009) (unpublished).  After a detailed recitation of the facts, the court rejected Petitioner's argument concerning the allegedly biased juror, holding that "defense counsel did not ask the questions needed to elicit the desired information."  <u>Id.</u> at *4.  The <u>Perez</u> court found that the introduction of the phone conversation between Ms. Perez and Detective Lee had been proper impeachment.  <u>Id.</u> at *5.  In addition, the court ruled that Petitioner had failed to preserve his challenges to the admissibility of Ms. Perez's testimony and to his own incriminating statement.  <u>Id.</u> at *5-6.  The appellate court also found that the trial court did not err in omitting the jury instruction on independent impulse.  <u>Id.</u> at *7.

The appellate court reserved the most space to a discussion on the sufficiency of the evidence in Petitioner's case.  Rejecting the argument that the state of mind necessary for murder had not been proven, the appellate court noted that "[e]vidence is sufficient to convict under the law of parties where the defendant is physically present at the commission of the offense and encourages its

12

commission by words or other agreement." Id. at 8 (quoting Ransom v. State, 920 S.W.2d 288, 302 (Tex. Crim. App. 1995)). The Perez court further observed that "the presence of the defendant at the scene ... is a circumstance tending to prove guilt." Id. at 9 (citing Beardsley v. State, 738 S.W.2d 681, 685 (Tex. Crim. App. 1987)). Finally, the appellate court reviewed each piece of evidence supporting Petitioner's culpable mental state, and those tending to undermine it, and concluded that "the evidence is legally sufficient for a rational jury to find appellant guilty of Riko's murder as a party to the crime beyond a reasonable doubt." Id.

On March 18, 2009, Petitioner filed a motion for rehearing with the appellate court, adding to the claims lodged by his attorney allegations of ineffective assistance of counsel and prosecutorial misconduct. (D.E. 22-7, 22-8). On June 25, 2009, Petitioner filed a pro se petition for discretionary review in the Texas Court of Criminal Appeals. (D.E. 22-9, at 1). He argued, inter alia, that the intermediate court erred in finding his challenge to the confession waived, and that the evidence had been insufficient to support his conviction because there was nothing to indicate that he was acting with the same common purpose as Mr. Lozano when he fired the weapon. (D.E. 22-12, at 12-19). The court declined to exercise discretionary review, Gonzalez v. Thaler, C-09-357 (S.D. Tex.), at (D.E. 4, at 151), and denied a subsequent motion for an en banc rehearing. (D.E. 22-15). On January 19, 2010, the United States Supreme Court denied a petition for writ of certiorari. Perez v. Texas, __ U.S. __, 130 S. Ct. 1149 (2010).

On March 23, 2010, Petitioner filed an application for a state writ of habeas corpus in his trial court. (D.E. 22, at 3). He presented a number of grounds for relief including: 1) no true bill of indictment was ever presented; 2) the burden of proof was improperly shifted; 3) the appellate court neglected to review the jury charge; 4) he received ineffective assistance of trial and appellate counsel; 5) he was denied counsel at a critical pretrial hearing; 6) exculpatory evidence was

13

improperly excluded; 7) various acts of prosecutorial misconduct occurred; 8) several judges were biased against him; and 9) his double jeopardy rights were violated.  Id. at 12-22.  He supplemented his application with a 200-page memorandum of law that elaborated each of these claims at length, as well as suggesting a number of others.  Id. at 43-177; (D.E. 22-1, at 1-66).

The prosecution answered, arguing that there was a valid indictment; that no improper shifting of the burden of proof occurred; that the jury instructions were appropriate; that Petitioner failed to allege ineffective assistance with sufficient specificity; that he was not denied counsel at a pretrial hearing because the hearing never took place; that he neglected to allege prosecutorial misconduct in his direct appeal and was thus barred from doing so in his habeas application; that there was no judicial bias; and that his double jeopardy argument was moot.  (D.E. 22-1, at 125-33).

On June 30, 2010, the trial court adopted all of the prosecution's arguments and recommended the application for habeas relief be denied.  Id. at 85-90.  The Court of Criminal Appeals adopted the recommendation.  (D.E. 4-18, at 1).  Petitioner then filed this petition on September 10, 2010.  (D.E. 1).

Mr. Gonzalez has also lodged several habeas challenges to his convictions in state and federal court, alleging, inter alia, that there was insufficient evidence to support his conviction, and that he was the victim of misconduct by prosecutors, law enforcement, and the trial court.  See Gonzalez v. Thaler, C-09-357 (S.D. Tex.), at (D.E. 2); Gonzalez v. Thaler, C-10-069 (S.D. Tex.), at (D.E. 1, 2).  He has also attacked various aspects of Petitioner's trial, including the distortion of fact and law by prosecutors and the trial court.  Gonzalez v. Thaler, C-09-357 (S.D. Tex.), at (D.E. 2); Gonzalez v. Thaler, C-10-069 (S.D. Tex.), at (D.E. 1, 2).  Mr. Gonzalez's claims have been rejected by every court that has thus far considered them.  See generally Gonzalez v. Thaler, C-09-357, 2010 WL 2710647 (S.D. Tex. May 11, 2010) (unpublished), recommendation adopted by 2010

14

WL 2710645 (S.D. Tex. July 6, 2010) (unpublished); <u>Gonzalez v. Thaler</u>, C-10-069, 2011 WL 284351 (S.D. Tex. Jan. 4, 2011) (unpublished), <u>recommendation</u> <u>adopted</u> <u>by</u> 2011 WL 283193 (S.D. Tex. Jan. 25, 2011) (unpublished).  Both of his federal habeas cases are currently pending in the Fifth Circuit Court of Appeals.  <u>Gonzalez v. Thaler</u>, No. 10-40689 (5th Cir. Oct. 20, 2010) (unpublished); <u>Gonzalez v. Thaler</u>, C-10-069 (S.D. Tex.), at (D.E. 51).

Finally, Mr. Lozano has attacked his conviction as well, albeit apparently with less vigor than his co-defendants.  An appellate court denied his direct appeal, holding, <u>inter</u> <u>alia</u>, that there was no prosecutorial misconduct in his case and that he did not receive ineffective assistance of counsel.  <u>Lozano v. State</u>, No. 13-08-180-CR, 2010 WL 411753, at *1 (Tex. App. Feb. 4, 2010) (unpublished).

### III.  PETITIONER'S ALLEGATIONS

Petitioner articulates a myriad of grounds for habeas relief, including several that he has added in his response to the motion for summary judgment.  (D.E. 1, 4, 33).  Many of his claims overlap substantially with one another and several others are difficult to interpret or place within a legal framework.  The following list is a rough breakdown of his claims by category: ineffective assistance of counsel at trial and on appeal, deprivation of counsel at a critical pretrial proceeding, insufficient evidence, a wide range of prosecutorial misconduct, various jurisdictional defects, actual innocence, flawed jury instructions, inappropriate shifting of the burden of proof, and a violation of his First Amendment right to petition the government for a redress of his grievances.  <u>Id.</u>  Because of these various alleged errors, Petitioner requests that his conviction be voided or, in the alternative, that an evidentiary hearing be held to develop the record on his claims.  (D.E. 4-1, at 1).  His more specific arguments and assertions are addressed below.

## IV.  DISCUSSION

Respondent urges that the petition be dismissed on the grounds that one of the claims is unexhausted and procedurally barred, four are procedurally defaulted, and the remaining are meritless.  (D.E. 30, at 1).

**A.      The Standard Of Review For Summary Judgment Motions.**

Rule 56 of the Federal Rules of Civil Procedure applies to federal habeas corpus cases.  Clark v. Johnson, 202 F.3d 760, 764-65 (5th Cir. 2000) (citations omitted).  Summary judgment is appropriate when there is no disputed issue of material fact, and one party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  Courts must consider the record as a whole, including all pleadings, depositions, affidavits, interrogatories and admissions on file, in the light most favorable to the non-movant.  Caboni v. Gen. Motors Corp., 278 F.3d 448, 451 (5th Cir. 2002) (citations omitted).

The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact and informing the court of the basis for its motion by identifying those portions of the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any, which support its contention.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Williams v. Adams, 836 F.2d 958, 960 (5th Cir. 1988) (citation omitted).  Any controverted evidence must be viewed in the light most favorable to the non-movant, and all reasonable doubts must be resolved against the moving party.  See Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 888 (1990); Williams, 836 F.2d at 960 (citation omitted).

If the moving party makes the required showing, then the burden shifts to the non-movant to show that a genuine issue of material fact remains for trial.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585-87 (1986); Fields v. City of S. Houston, 922 F.2d 1183, 1187 (5th

Cir. 1991) (citation omitted).  The non-movant cannot merely rest on the allegations of the pleadings, but must establish that there are material controverted facts in order to preclude summary judgment. Fed. R. Civ. P. 56(e); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986) (citation omitted).  Summary judgment is proper if the non-movant fails to make a showing sufficient to establish the existence of an element essential to his case on which he bears the burden of proof. Celotex, 477 U.S. at 322-23; ContiCommodity Servs., Inc. v. Ragan, 63 F.3d 438, 441 (5th Cir. 1995) (citations omitted).

**B.      Federal Habeas Corpus Standard Of Review Pursuant To The AEDPA.**

Federal habeas relief is available to a state prisoner only if he is being held in violation of the Constitution, laws, or treaties of the United States.  Boyd v. Scott, 45 F.3d 876, 881 (5th Cir. 1994) (per curiam) (citation omitted).  Pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), courts may not grant habeas relief unless a petitioner demonstrates that the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law," or was "based on an unreasonable determination in light of the facts."  28 U.S.C. § 2254(d).  Thus, "federal habeas relief is only merited where the state court decision is both incorrect *and* objectively unreasonable."  Morrow v. Dretke, 367 F.3d 309, 313 (5th Cir. 2004) (emphasis in original) (citing Williams v. Taylor, 529 U.S. 362, 411 (2000)); see also Riddle v. Cockrell, 288 F.3d 713, 716 (5th Cir. 2002).  The AEDPA's provisions "ensure that state-court convictions are given effect to the extent possible under law."  Bell v. Cone, 535 U.S. 685, 693 (2002) (citing Williams, 529 U.S. at 403-04).

The Supreme Court has concluded that the "contrary to" and "unreasonable application" clauses of § 2254(d)(1) have independent meanings.  Id. at 694 (citing Williams, 529 U.S. at 404-05). The Bell Court elaborated on the distinctions between "contrary to" and an "unreasonable

17

application:"

> A federal habeas court may issue the writ under the "contrary to"
> clause if the state court applies a rule different from the governing law
> set forth in our cases, or if it decides a case differently than we have
> done on a set of materially indistinguishable facts.  The court may
> grant relief under the "unreasonable application" clause if the state
> court correctly identifies the governing legal principle from our
> decisions but unreasonably applies it to the facts of the particular case.
> The focus of the latter inquiry is on whether the state court's
> application of clearly established federal law is objectively
> unreasonable, and we stressed in *Williams* that an unreasonable
> application is different from an incorrect one.

Id. (citations omitted).

The Fifth Circuit has explained that the "contrary to" clause applies where a "state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Hill v. Johnson, 210 F.3d 481, 485 (5th Cir. 2000) (citation omitted).  The Fifth Circuit has further determined that "§ 2254(d) permits a federal habeas court 'to review only a state court's 'decision' and not the written opinion explaining that decision.'" St. Aubin v. Quarterman, 470 F.3d 1096, 1100 (5th Cir. 2006) (citing Neal v. Puckett, 286 F.3d 230, 246 (5th Cir. 2002) (en banc) (per curiam)); accord Anderson v. Johnson, 338 F.3d 382, 390 (5th Cir. 2003) (citation omitted).  The state court's "ultimate decision" is to be tested for reasonableness, "not every jot of its reasoning." Santellan v. Cockrell, 271 F.3d 190, 193 (5th Cir. 2001).  Furthermore, a state court need not cite, or "even be aware of [Supreme Court] precedents, 'so long as neither the reasoning nor the result of the state-court decision contradicts them.'" Mitchell v. Esparza, 540 U.S. 12, 16 (2003) (quoting Early v. Packer, 537 U.S. 3, 8 (2002)).

Absent a direct conflict with Supreme Court authority, habeas relief is available if a state court decision is objectively unreasonable.  Montoya v. Johnson, 226 F.3d 399, 404 (5th Cir. 2000).

18

A federal district court "must reverse when [it] conclude[s] that the state court decision applies the correct legal rule to a given set of facts in a manner that is so patently incorrect as to be 'unreasonable.'" Gardner v. Johnson, 247 F.3d 551, 560 (5th Cir. 2001). As with the "contrary to" test, the focus of the "unreasonable application" test is "on the ultimate legal conclusion that the state court reached and not on whether the state court considered and discussed every angle of evidence." Neal, 286 F.3d at 246.

Finally, "[t]he AEDPA requires that [the Court] presume correct the state court's findings of fact unless the petitioner 'rebut[s] the presumption of correctness by clear and convincing evidence.'" Morrow, 367 F.3d at 315 (quoting 28 U.S.C. § 2254(e)(1)). The presumption of correctness is also accorded to adjudications made during state post-conviction proceedings. Id. The burden to rebut the presumption of correctness remains on the petitioner even if the state "hearing was a 'paper' hearing and may not have been full or fair." Id. (citing Valdez v. Cockrell, 274 F.3d 941, 950-51 (5th Cir. 2001)). In some circumstances, findings of fact may be implied from conclusions of law. See Valdez, 274 F.3d at 948 n.11 ("The presumption of correctness not only applies to explicit findings of fact, but it also applies to those unarticulated findings which are necessary to the state court's conclusions of mixed law and fact.") (citations omitted); Goodwin v. Johnson, 132 F.3d 162, 183-84 (5th Cir. 1997).

**C.    Petitioner's Claims Should Not Be Regarded As Procedurally Defaulted.**

Respondent contends that four of Petitioner's claims were raised in his state habeas application in a "procedurally incorrect manner" and should therefore be considered procedurally defaulted. (D.E. 30, at 15). These claims encompass his ineffective assistance grounds at trial and appeal as well as several of his prosecutorial misconduct allegations. Id. Petitioner insists that these claims are not procedurally defaulted, suggesting that he did in fact raise them and that any

procedural mistakes he made in the state courts resulted from misleading and confusing instructions. (D.E. 33, at 10). He further contends that any default be excused because he is actually innocent of murder. Id. at 9.

The Fifth Circuit has explained that "the state court system must have been presented with the same facts and legal theory upon which the petitioner bases his current assertions." Ruiz v. Quarterman, 460 F.3d 638, 643 (5th Cir. 2006) (citing Picard v. Connor, 404 U.S. 270, 275-77 (1971)). A habeas petitioner must also present his claims in accordance with the state court's procedural rules. Mercadel v. Cain, 179 F.3d 271, 275 (5th Cir. 1999) (per curiam) (citation omitted). If the petitioner fails in this respect, and "the last state court to consider the claim expressly and unambiguously based its denial of relief on a state procedural default," federal courts are "procedurally barred" from reviewing the claim. Fisher v. Texas, 169 F.3d 295, 300 (5th Cir. 1999) (citing Coleman v. Thomas, 501 U.S. 722, 729 (1991)). "This rule of comity reduces friction between the state and federal court systems by avoiding the 'unseem[liness]' of a federal district court's overturning a state court conviction without the state courts having had an opportunity to correct the constitutional violation in the first instance." O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999) (citations omitted). In Texas, the highest court for habeas review is the Texas Court of Criminal Appeals. Tex. Code Crim. Proc. art. 4.04, § 2; Richardson v. Procunier, 762 F.2d 429, 431-32 (5th Cir. 1985).

Respondent is correct that a Texas state court found that several of Petitioner's claims were not cognizable in a habeas application for various procedural reasons. (D.E. 22-21, at 87-90). However, he points to the state trial court's recommendations regarding habeas relief, rather than the Court of Criminal Appeals' rulings on the claims. (D.E. 30, at 15-16). In fact, neither party has truly

addressed the Court of Criminal Appeals' decision itself.  Petitioner submitted a cover sheet describing it, but there does not appear to be any document following it.  (D.E. 4-18, at 1).

In any event, Petitioner appears to acknowledge that the Court of Criminal Appeals adopted the recommendations of the trial court in their entirety, given that he describes its opinion as a "denial on the findings of the trial court."  Id.; see also Harrington v. Richter, __ U.S. __, 131 S. Ct. 770, 784 (2011) ("whether a state court's decision resulted from an unreasonable legal or factual conclusion does not require that there be an opinion from the state court explaining the state court's reasoning") (citations omitted).  Nevertheless, given the sprawling nature of Petitioner's numerous filings in state court, the complexity and convolution of the record, and the substantial overlap between many of his arguments, it is difficult to ascertain which, if any, of his claims should be considered procedurally defaulted.  Moreover, the central issue that the Texas state courts have addressed, and addressed at the greatest length, is closely related to many of the claims lodged by Petitioner.  Taking the evidence in the light most favorable to Petitioner, therefore, there is too much ambiguity in the record to grant summary judgment for Respondent on the ground that any of Petitioner's claims are procedurally defaulted.

Accordingly, it is respectfully recommended that none of Petitioner's claims be considered procedurally defaulted for purposes of summary judgment, and that they each be addressed on the merits.

**D.     Petitioner Is Not Actually Innocent.**

In the alternative, claims that have been procedurally defaulted may nonetheless proceed if a petitioner makes a sufficiently compelling showing that he is actually innocent.  Schlup v. Delo, 513 U.S. 298, 327 (1995).  "Actual innocence means 'factual innocence, and not mere legal

insufficiency.'" <u>United States v. Jones</u>, 172 F.3d 381, 384 (5th Cir. 1999) (per curiam) (citation omitted).  "To prove actual innocence, the petitioner 'must demonstrate that, in light of all the evidence, it is more likely than not that no reasonable juror would have convicted him.'" <u>Id.</u> (citation omitted).  This determination is made "'in light of all the evidence, including that alleged to have been illegally admitted ... and claimed to have been wrongfully excluded or to have become available only after the trial.'" <u>Bosley v. Cain</u>, 409 F.3d 657, 662 (5th Cir. 2005) (per curiam) (citation omitted).  As the Supreme Court explained,

> a substantial claim that constitutional error has caused the conviction of an innocent person is <u>extremely rare</u>.  To be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence-whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence-that was not presented at trial.

<u>Schlup</u>, 513 U.S. at 324 (internal citation omitted) (emphasis added).

Although Petitioner argues in his response to the motion for summary judgment that he is actually innocent of murder, he does not allege the existence of any new evidence.  (D.E. 33, at 9).  Nor does he otherwise show that no reasonable juror could have convicted him.  Indeed, his claim of actual innocence is not really classifiable as such in a federal habeas petition.  Instead, it is predicated, like many of his other claims, on his personal disagreement with the definition of murder in Texas, and its application in his case.  He does not contest the fundamental facts upon which his conviction rests.  His claim of actual innocence is therefore at most a claim of legal insufficiency.  See <u>Jones</u>, 172 F.3d at 384.

Accordingly, it is respectfully recommended in the alternative that if the Court finds any of Petitioner's claims procedurally defaulted, that it also find that he has not made the required showing of innocence to proceed on them despite the default.

**E.      The Evidence Was Sufficient To Support Petitioner's Conviction.**

Petitioner's main thesis regarding the sufficiency of the evidence is that there was nothing introduced at trial to prove that Mr. Lozano fired the shots with intent to kill, or knowledge that Mr. Rodriguez was behind the door at the moment he pulled the trigger.  (D.E. 4-5, at 13).  He further contends that even if Mr. Lozano did intend to inflict harm upon Mr. Rodriguez in shooting the gun, that there is no evidence that Petitioner knew of that intent or sought to facilitate the death.  Id.

Respondent argues to the contrary that the intermediate state court opinion on Petitioner's direct appeal made a reasonable determination that the evidence was sufficient, and that there are no grounds to disturb that ruling.  (D.E. 30, at 24).  Petitioner contends in response that he has rebutted the presumption of reasonableness that attaches to the state finding by pointing to substantial gaps in the prosecution's case against him.  (D.E. 33, at 25-30).

In determining whether the evidence is sufficient to support a conviction in a habeas claim, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original) (citation omitted); accord Dupuy v. Cain, 201 F.3d 582, 589 (5th Cir. 2000) (citing Jackson).  "[A]ll reasonable inferences are drawn in support of the verdict."  United States v. Cyprian, 197 F.3d 736, 740 (5th Cir. 1999) (citation omitted).  Furthermore, the court must accept the credibility determinations of the jury, and must not re-weigh the evidence.  Id.

The following facts were amply established at trial and Petitioner has never disputed them. He felt some hostility toward Mr. Rodriguez as a result of the latter's relationship to his ex-wife and young daughter.  The two men had at least one physical altercation, several days before the shooting.

23

Petitioner suggested that Mr. Gonzalez and Mr. Lozano accompany him to the apartment where Mr. Rodriguez was staying very early in the morning. At Petitioner's direction, a gun was obtained en route to the apartment. Mr. Lozano fired the gun through the closed door of the apartment, striking and killing Mr. Rodriguez. These facts represent compelling circumstantial evidence that Petitioner planned to inflict harm upon Mr. Rodriguez and that Mr. Lozano's actions were in furtherance of that intent. See Roberts v. State, 273 S.W.3d 322, 327 (Tex. Crim. App. 2008) (emphasizing circumstantial evidence connecting defendant to commission of murder as a party); Vodochodsky v. State, 158 S.W.3d 502, 509-11 (Tex. Crim. App. 2005) (discussing circumstantial evidence regarding intent in a murder case brought under the law of parties and finding insufficient evidence of intent where there was "no ... information in the record suggesting that [the defendant] was planning the event [and] no evidence that [he] actually did any affirmative act to assist" the shooter).

Though not uncontroverted, there was also significant evidence introduced at trial through testimony and various recorded statements and exhibits to suggest to a rational juror the truth of the following: that Petitioner threatened Mr. Rodriguez shortly before the shooting and that Mr. Lozano might have had reason to believe that the victim was behind the door when he pulled the trigger.

Collectively, this evidence is more than sufficient to support a conviction for murder under Texas state law. See, e.g., Cordova v. State, 698 S.W.2d 107, 111 (Tex. Crim. App. 1985) ("Evidence is sufficient to convict the defendant under the law of parties where he is physically present at the commission of the offense, and encourages the commission of the offense either by words or other agreement.") (en banc) (citation omitted). Petitioner was physically present at the commission of the offense, and it was within the province of the jury to give credence to the evidence suggesting that he encouraged Mr. Lozano to commit the crime. Consequently, his sufficiency of the

evidence claim must fail.  See generally Montoya v. Scott, 65 F.3d 405, 415 (5th Cir. 1995) (holding, in a Texas murder case tried under law of parties, that "'one who has been indicted as a principal may ... be convicted on evidence showing only that he aided and abetted the commission of the offense'") (citation omitted).

Petitioner points to several pieces of evidence in the record that are in tension with the prosecution's version of events and thus cut against the finding of a culpable mental state.  These include various witness accounts suggesting that Mr. Lozano acted of his own volition, that he could not have been aware of Mr. Rodriguez's location in the apartment when he was shot, and that Petitioner did not encourage him to shoot the gun, did not expect him to, and likewise had no reason to believe that Mr. Rodriguez was behind the door when he was killed.  In addition to citing this evidence, Petitioner attacks the credibility of several of the prosecution's witnesses and opines on the weakness he perceives in other pieces of evidence used at his trial.

Petitioner's attack on the prosecution's case is not completely lacking in persuasiveness. Nevertheless, a petition for federal habeas relief by a state prisoner attacking his conviction is not the proper forum to re-evaluate the evidence used at his trial.  Cyprian, 197 F.3d at 740.  Petitioner's naked assertion that "the evidence showed that the defendant had said 'Forget this, lets [sic] go,' he disengaged, and he was going back to the car before his co-defendant ever pulled the pistol out of his pocket" is simply not true.  (D.E. 37, at 10).  The evidence did not "show" this.  Some evidence suggested the truth of Petitioner's account, and some suggested its falsity, and the jury chose to favor the prosecution's version of events.  Indeed, the argument Petitioner makes now is essentially a reiteration and further elaboration of the case his trial counsel made in court.  That case was ably presented, but he was convicted.  Twelve jurors were convinced beyond a reasonable doubt that

Petitioner acted with the requisite intent to commit murder.  A Texas appellate court reaffirmed that there was sufficient evidence to support that determination.  It is not the role of this Court to re-weigh the evidence or assess the credibility of witnesses.  <u>Cyprian</u>, 197 F.3d at 740.  In light of the state court's ruling and the deference it warrants, there are no grounds to grant federal habeas relief on the grounds that the evidence was insufficient to support Petitioner's conviction.

Furthermore, many of the arguments Petitioner has styled as attacks on the sufficiency of the evidence cannot properly be categorized as such for purposes of federal habeas jurisprudence.  Indeed, he has not contested the bulk of the basic factual narrative put forth by the prosecution.  For example, Petitioner notes that he told detectives that he "instigated the visit" to the apartment, and that he personally "picked up the pistol, and gave it to Lozano."  (D.E. 4-1, at 10).  Moreover, he has repeatedly insisted, perhaps somewhat hyperbolically, that the "only" issue at his trial was whether he acted with the requisite <u>mens</u> <u>rea</u> to constitute murder.

In other words, Petitioner does not truly dispute the sufficiency of the evidence, he disputes the definition of murder in Texas and its application to his case.  Many of Petitioner's arguments can consequently be distilled into a moral claim that an individual who committed the actions that he committed with respect to the death of Mr. Rodriguez <u>should not</u> be considered to have committed murder, and that it is therefore unjust to impose a life sentence on someone for those acts.  But neither he nor this Court sit in judgment of the jurisprudential soundness of Texas criminal law.  The crime of murder in Texas was defined by the Texas legislature and is applied by the Texas judiciary, including application in Petitioner's case.  Whatever the merits of his grievances with the Texas murder statute, therefore, they are not cognizable claims on federal habeas review.

Accordingly, it is respectfully recommended that summary judgment should be granted

26

against Petitioner on his insufficient evidence claim.

**F.     Petitioner Has Not Shown Prosecutorial Misconduct.**

The Supreme "Court has recognized that prosecutorial misconduct may 'so infec[t] the trial with unfairness as to make the resulting conviction a denial of due process.'"  Greer v. Miller, 483 U.S. 756, 765 (1987) (citation omitted).  In order to establish a habeas claim, "the prosecutorial misconduct must be 'of sufficient significance to result in the denial of the defendant's right to a fair trial.'"  Id. (citation omitted).  A petitioner has the burden of showing the prosecutor's actions infected the trial with such unfairness that the conviction resulted from a denial of due process. Kutzner v. Johnson, 242 F.3d 605, 609 (5th Cir. 2001) (citations omitted).

Petitioner accuses the prosecution at his trial of committing a number of violations that infringed on his rights, including forging his indictment, tampering with and withholding evidence, misstating the law and facts at his trial, making a critical defense witness unavailable to testify, coercing another into testifying against him, vouching for a witness's credibility while eliciting perjured testimony from him, and making inflammatory remarks at his sentencing hearing.  (D.E. 1, at 14-15; D.E. 4-4, at 28-31).

**1.     The prosecution did not commit a Brady violation.**

In Brady v. Maryland, the Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  373 U.S. at 87.  To establish a Brady violation, a defendant "'must show that (1) the prosecution suppressed evidence, (2) the evidence was favorable to the defense, and (3) the evidence was material' to his guilt or punishment."  Mahler v. Kaylo, 537 F.3d 494, 500 (5th Cir. 2008) (citations

27

omitted).  If even one of these elements is lacking, inquiry into the others is unnecessary and the claim fails.  Id. (citation omitted); United States v. Hughes, 230 F.3d 815, 819 (5th Cir. 2000). Finally, the burden is on the defendant to show that he exercised due diligence in seeking the material.  Mahler, 537 F.3d at 500; United States v. Marrero, 904 F.2d 251, 261 (5th Cir. 1990).

Petitioner alleges that the prosecution deleted portions of his video statement.  (D.E. 1, at 14). He does not make clear which portions were deleted, or how the excision prejudiced him.  Nor does he explain how a videotaped interview in which he fully participated was unavailable or unknowable to him at the time of trial.

Furthermore, a review of his interview indicates that the unedited tape would have been sufficiently incriminating and that prosecutors would not have had any compelling reason to tamper with it.  The story he tells in it is more or less the story that was ultimately presented by the prosecution, at least in part.  It was manifestly one of the most damning pieces of evidence used against him, as evidenced by his attempt at trial and on appeal to attack its admission.  Those segments of the interrogation during which Petitioner is not relating incriminating information, he is unsuccessfully attempting to extract a promise of lenience in return for assisting the investigation. None of the tape appears to benefit Petitioner's case.  He has not shown that the evidence was suppressed, nor that it was favorable.  Mahler, 537 F.3d at 500.

Accordingly, it is respectfully recommended that the prosecution did not commit a Brady violation.

2.      **The prosecution did not knowingly use perjured testimony.**

The Fifth Circuit has determined that in order for a petitioner to prevail on a denial of due process claim because the prosecution knowingly used perjured testimony, or allowed untrue testimony to go uncorrected, the petitioner must prove that: "(1) the testimony was actually false, (2) the state knew it was false and (3) the testimony was material." Faulder v. Johnson, 81 F.3d 515, 519 (5th Cir. 1996) (citation omitted).   Inconsistencies between or within witness testimony are insufficient to prove perjury.   See Koch v. Puckett, 907 F.2d 524, 531 (5th Cir. 1990) (citation omitted).

Petitioner alleges that the prosecution coerced Mr. Asberry into testifying falsely.  (D.E. 1, at 14).  Although some doubt was cast on the credibility of Mr. Asberry's testimony regarding what he heard on the morning of the shooting, it would hugely overstate the point to suggest that it was ever proven false.  Indeed, any lack of credibility that was suggested was the result of inconsistencies with other witness statements, precisely the sort of source that cannot substantiate such a claim. Koch, 907 F.2d at 531.  It stands to reason, consequently, that there is no indication that the prosecution knew it was false.

Accordingly, it is respectfully recommended that the prosecution did not knowingly use perjured testimony.

3.      **Petitioner's remaining claims of prosecutorial misconduct are meritless.**

Petitioner lodges a wide array of other prosecutorial misconduct charges, all of which are equally without merit.  Among them, he accuses prosecutors of forging his indictment, an allegation that apparently evolved from his original contention that there was no indictment at all.  (D.E. 4-1, at 5-6; D.E. 33, at 14).  However he cares to frame the argument, it is frivolous.  Copies of the

indictment appear throughout the record, the state court vouched for its authenticity, and Petitioner has provided no evidence to doubt it.  <u>See</u>, <u>e.g.</u>, (D.E. 22-1, at 82, 85).

Petitioner also alleges that the prosecution deliberately and improperly kept Mr. Flores from testifying at trial. (D.E. 1, at 13; D.E. 4-4, at 10).  He believes that Mr. Flores would have offered exculpatory testimony on the lack of intent or knowledge on the part of Mr. Lozano in the death of Mr. Rodriguez.  (D.E. 4-4, at 7).  The record reflects that attorneys on both sides, as well as the trial court, expended considerable effort in attempting to locate Mr. Flores to compel him to appear at trial.  (D.E. 22-21, at 14, 63; D.E. 22-23, at 5).  When those efforts failed, the prosecution agreed as a compromise to allow the jury to consider his previous statements.  (D.E. 22-24, at 29).  Petitioner has no evidence that the prosecution or anyone else hid Mr. Flores, nor has he presented any reason to suppose that Mr. Flores' testimony would have exonerated him or even helped his case.

The alleged misstatements of law that Petitioner believes infected his trial appear to be iterations of the theory of murder under which he was convicted and his conviction upheld.  These were not misstatements, they were accurate expositions that were subsequently affirmed by the appellate court.  For example, Petitioner complains that the prosecution "indicated that the State need not prove that Perez intended or knew that his conduct was going to cause the prohibited result." (D.E. 38, at 3).  If "prohibited result" refers to Mr. Rodriguez's death, and if the prosecution did indeed indicate that, there was no error, as that is an accurate description of Texas law.  <u>See</u> <u>Ex parte Martinez</u>, __S.W.3d __, 2011 WL 93009, at * 8 (Tex. Crim. App. Jan. 12, 2011) ("A person can be convicted of capital murder as a party to the offense, without having had the intent to commit the murder.") (citations omitted).  This line of attack on the prosecution is really an attack on the definition of murder in Texas, and is addressed below.

Petitioner also attacks the prosecutor for telling the jury that he did not "have to prove which way it happened."  (D.E. 38, at 2).  Although not expressed with crystal clarity, the prosecutor was evidently suggesting that he was not required to limit himself to one particular theory of murder or manslaughter, but could argue generally that Petitioner was culpable and allow the jury to convict under whichever theory it found most appropriate.  It is arguable whether the prosecution followed that strategy but certainly not improper to suggest that it might have.

It is not entirely clear what facts Petitioner understands to have been distorted, though he does repeatedly reference a time-line that was drawn by prosecutors during closing arguments.  According to Petitioner, this time-line falsified the date of Mr. Asberry's interview with police and thereby resulted in a "double impeachment" of Ms. Perez.  (D.E. 4-4, at 28).  It strains credulity to imagine that this error, whatever it was, could have prejudiced him, given that Ms. Perez's testimony was, on the whole, unfavorable, and given the wide array of other, far more significant, pieces of evidence used to show his guilt.

Petitioner believes that the prosecution improperly vouched for Mr. Asberry's credibility as a witness.  (D.E. 1, at 14).  In particular, he cites the fact that the prosecution recited at closing argument Mr. Asberry's account of Petitioner threatening to return to the apartment to attack the victim after their scuffle.  Id. at 15.  "An attempt to bolster a witness by vouching for his credibility ordinarily is improper and constitutes error."  United States v. Leslie, 759 F.2d 366, 378 (5th Cir. 1985) (citation omitted).

It is an advocate's responsibility to summarize the testimony favorable to his position at the close of a trial, and the prosecutor was discharging his duty in reminding the jury of Mr. Asberry's statements.  His decision to refer to Mr. Asberry as the only witness "who doesn't have a dog in this

fight" was less warranted (and arguably misleading), but it was most likely a reference to Ms. Perez, who did potentially have a bias.  In any event, it is difficult to imagine that the comment did any considerable harm to Petitioner given the fact that most of the other witnesses, including Ms. Perez, were called by the prosecution, and the fact that the defense witnesses did not offer any important exculpatory testimony.  Furthermore, the jury was fully and accurately advised of its duties as fact-finder and as judge of credibility.  See United States v. Williams, 343 F.3d 423, 438 (5th Cir. 2003) (finding that prosecution did not commit misconduct by eliciting testimony from one witness regarding another's credibility where "court properly instructed the jury on its role as fact-finder") (citation omitted).  Lastly, defense counsel ably and vigorously attacked Mr. Asberry's credibility, thus minimizing the damage of any improper vouching and preventing any error from infecting the trial with unfairness severe enough to deprive Petitioner of his due process rights.  (D.E. 22-22, at 19-23, 25-29).

Petitioner asserts that the prosecutor made inflammatory remarks at his sentencing hearing, particularly when he compared him to the literary character of Dr. Jekyll and Mr. Hyde and his prior drug offense to the St. Valentine's Day Massacre.  (D.E. 4-4, at 30) (citing Steele v. United States, 222 F.2d 628, 631 (5th Cir. 1955)).  Subsequent Fifth Circuit opinions interpreting Steele make clear that its condemnation of the Dr. Jekyll comparison was grounded in part on the fact that "[t]his type of shorthand characterization of an accused, not based on evidence, is especially likely to stick in the minds of the jury and influence its deliberations."  Hall v. United States, 419 F.2d 582, 587 (5th Cir. 1969) (emphasis added).  Here, although perhaps melodramatic, the prosecutor's comparison alluded to evidence that Petitioner was capable of being a good father and respectable citizen, and simultaneously capable of bringing a volatile, armed man to a residential apartment at 5:30 in the

32

morning.  It is difficult to dismiss the aptness of the analogy entirely.

The prosecution's decision to link a relatively minor drug offense with the brutal slaying of seven people by gangsters is less easy to defend.  Nevertheless, the prosecutor was clearly making a point, however overstated and inappropriately sarcastic, about Petitioner's failure to take responsibility for his prior conviction.  This was a fair point to make, given Petitioner's regrettable decision to so flippantly write off the seriousness of a prior conviction at the sentencing phase of his murder trial.

Lastly, a review of the record indicates that the prosecution pursued its case appropriately and within the bounds of the law.  The evidence was sufficient to justify Petitioner's conviction and the severity of his sentence.  Although there were statements by both sides at trial that were not models of clarity, as there are in any trial, any ambiguity or confusion was ultimately inconsequential.  Most of the facts were not in dispute, the facts that were in dispute were well-delineated for the jury's consideration, and the law was accurately presented to the jury.  Whatever additional allegations of prosecutorial misconduct that might be gleaned from Petitioner's filings, therefore, do not warrant habeas relief.

Accordingly, it is respectfully recommended that any remaining claims of prosecutorial misconduct be dismissed.

**G.    The Jury Charges Were Proper.**

Petitioner contends that the jury was presented with a distorted definition of murder, insofar as a reckless element was added to a first degree murder charge.  (D.E. 4-1, at 27).  Specifically, he believes that the definition of "knowingly" presented was applicable only to Mr. Lozano, not himself.  Id. at 28.  He argues that "the State inserted the equivalent of a definition of second degree

manslaughter into a first degree murder charge." (D.E. 4-2, at 28). Petitioner maintains that the mental state required in a murder conviction was also incorrectly defined, as it was applied to accompany the result of his conduct rather than its nature. Id. at 4; (D.E. 33, at 22-25).

For a federal habeas challenge to a jury charge in a state prosecution to prevail, the petitioner is required to demonstrate that the defective instruction so infected the overall proceedings that the conviction violates due process. Estelle v. McGuire, 502 U.S. 62, 72 (1991) (citations omitted). The charge cannot be considered in isolation but rather within the context of the whole trial. United States v. Frady, 456 U.S. 152, 169 (1982) (citation omitted). Finally, even an improper instruction only warrants habeas relief where it had a substantial influence on the guilty verdict. Brecht v. Abrahamson, 507 U.S. 619, 637 (1993) (citation omitted).[4]

Petitioner does not meet these standards. The pertinent jury instructions all came directly from the Texas Penal Code. Murder and manslaughter were each defined by way of precise and accurate quotations from the state laws that prohibit those offenses. Compare (D.E. 22-1, at 95) with Tex. Penal Code §§ 19.02, 19.04. Likewise, the charges regarding intentional, knowing, and reckless conduct were taken straight out of criminal statutes. Compare (D.E. 22-1, at 96) with Tex. Penal Code § 6.03. Finally, the instruction on the law of parties did not diverge from the provision codifying that concept. Compare (D.E. 22-1, at 99) with Tex. Penal Code §§ 7.01, 7.02.

---

4 Petitioner accurately notes that in some circuits a less rigorous standard is applied to jury instructions in federal habeas cases depending on how the state courts addressed the issue. See, e.g., Seiler v. Thacker, 101 F.3d 536, 539 (8th Cir. 1996) (citation omitted). However, this is not the rule in the Fifth Circuit. Barber v. Johnson, 145 F.3d 234, 236 (5th Cir. 1998) ("'Brecht rather than Chapman, enunciates the appropriate standard for determining whether a constitutional error was harmless in a federal habeas challenge to a state conviction or sentence even though no state court ever made any determination respecting whether or not the error was harmless.'") (citations omitted). In any event, the potential minor flaw in the jury instructions discussed below does not rise to the level of a constitutional error and therefore does not implicate either standard. Furthermore, if it were considered a constitutional error, it would fail to satisfy either Brecht or Chapman. Chapman v. California, 386 U.S. 18, 24 (1967) ("before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt").

Moreover, the court did not, as Petitioner maintains, mistakenly instruct the jury on criminally negligent conduct under the guise of defining reckless conduct.  (D.E. 37, at 7).  That mental state is identical to recklessness but for the distinction that the actor ought to be aware of the risk, rather than actually being aware of it and consciously disregarding it.  Tex. Penal Code § 6.03.  Again, the court correctly took the formulation of the latter, not the former.  Compare id. with (D.E. 22-1, at 96).  Furthermore, the recklessness definition is essentially irrelevant to Petitioner's claim, as it was only in the jury instructions to elaborate the lesser included offense of manslaughter, which the jury elected not to apply.

Petitioner calls attention to the jury instruction explaining that a person can be guilty if the criminal act itself is performed "by the conduct of another for which [the defendant] is criminally responsible."  (D.E. 37, at 2).  He appears to believe that this instruction means "that the State didn't have to prove the existence" of a culpable mental state attaching to his own conduct.  Id.  What he misses is that the concept of "criminal responsibility" carries with it the culpable mens rea required of the offense, as was clearly demonstrated by the full jury charge on the law of parties.  (D.E. 22-1, at 100) (requiring, for a finding of Petitioner's guilt, that "the defendant ... acted with intent to promote or assist the commission of the offense").

Petitioner's argument regarding the distinction between "result of conduct" offenses and "nature of conduct" offenses presents a more complex question.  He is correct that intentional murder falls in the former category.  See generally Cook v. State, 884 S.W.2d 485, 490-92 (Tex. Crim. App. 1994) (en banc); Moreno v. Dretke, 450 F.3d 158, 172 (5th Cir. 2006) ("Under Cook, a jury in an intentional murder case should be instructed that the defendant must have acted knowingly or intentionally with respect to the 'result of his conduct' to be convicted.").  He is also correct that his

35

jury instructions defined knowing conduct with reference to both the result and the nature of the conduct.  (D.E. 22-1, at 96).  Petitioner, however, was not convicted of <u>intentional</u> murder, he was convicted of murder under the law of parties.  Although Petitioner's jury charges included a section allowing for his conviction if he pulled the trigger, he was almost certainly convicted instead under an accomplice theory of liability, as neither the prosecution nor any witness ever alleged that he fired the gun.  See <u>Ruiz v. State</u>, 579 S.W.2d 206, 209 n.1 (Tex. Crim. App. 1979) (considering a conviction under the law of parties based on the evidence presented by the prosecution at trial, despite allegations of intentional murder in the indictment).

This fact alters the analysis considerably.  For under the law of parties, the <u>mens rea</u> requirement for murder is significantly loosened.  See <u>Johnson v. State</u>, 739 S.W.2d 299, 302 (Tex. Crim. App. 1987) (en banc) ("submission of the law of parties under § 7.02(a)(2) ... invariably makes it possible for the State to obtain a conviction on less than sufficient evidence to establish the accused actually committed an offense as otherwise defined in the Penal Code"); <u>Ex parte Martinez</u>, __S.W.3d __, 2011 WL 93009, at * 8 (discussing conspiracy provision of Texas law of parties); <u>Wood v. State</u>, 4 S.W.3d 85, 89 (Tex. App. 1999) ("Notwithstanding the requirement that an actor charged with capital murder must have specifically intended to cause the death of another, [the law of parties] explains that a *party* may still be criminally responsible for the acts of another *even though the party did not intend for the act to occur as a result of his conduct*.") (emphases in original) (citing conspiracy provision of the law of parties); <u>Richard v. State</u>, 830 S.W.2d 208, 213 (Tex. App. 1992) (under law of parties, "the State did not have to prove that appellant intended for Foster to cause Griffin's death" where he "acted with intent to promote or assist in the commission of the offense by soliciting, encouraging, directing, aiding or attempting to aid Foster in its commission").

The jury was properly instructed on the law of parties. (D.E. 22-1, at 99-100). Those instructions compelled the jury to vote guilty if Mr. Lozano "intentionally or knowingly commit[ed] murder" and Petitioner "knew of the intent ... of Michael Lozano to commit murder [and] acted with intent to promote or assist the commission of the offense." Id. at 100. Intent, unlike knowledge, was never defined with reference to the "nature of conduct."

Therefore, the only error that could possibly have been perpetrated by the instructions would have been for the jury to find Mr. Lozano's act to constitute murder only under the "nature of conduct" definition of knowingly supplied earlier in the instructions, but then find Petitioner not guilty or only guilty of manslaughter if not for his conclusion. As an initial matter, it is not clear that such a jury would necessarily have erred under Texas law. See Medina v. State, 7 S.W.3d 633, 640 (Tex. Crim. App. 1999) ("for knowing murders, the distinction between result of conduct and nature of conduct blurs because awareness of the result of the conduct necessarily entails awareness of the nature of the conduct as well"); Murphy v. State, No. AP-74851, 2006 WL 1096924, at *20 (Tex. Crim. App. Apr. 26, 2006) (unpublished) (noting that an individual can be guilty of "knowing murder" under law of parties and that "no evidence of the specific intent to kill" is then required) (citation omitted).

More importantly, this scenario is exceedingly unlikely, if not logically impossible. For the jury was required to find that Petitioner knew of Mr. Lozano's murderous intent in order to convict; they could not, by the plain language of the instructions, have found Petitioner's awareness of any culpable state of mind on the part of his co-defendant that rose only to the level of knowingly sufficient to support a guilty verdict. In other words, the jury Petitioner hypothesizes looked at "knowingly" in the description of Mr. Lozano's conduct and relied exclusively upon the "nature of

conduct" definition provided earlier, and then promptly ignored the explicit <u>mens</u> <u>rea</u> requirement in the very next sentence, finding him guilty according to the same definition despite the instruction's explicit language to the contrary.

An argument requiring the construction of such an implausible jury, so scrupulous one moment and so careless the next, falls far short of the bar. Far more likely, the imaginary jury would, after mistakenly determining that Mr. Lozano committed knowing murder as a "nature of conduct" offense, immediately realize that Petitioner could not be convicted if that were the only ground for finding Mr. Lozano guilty of murder and either vote for an acquittal, vote for manslaughter, or find an alternative theory under which to convict Petitioner of murder. <u>See</u> <u>Moore v. Quarterman</u>, 534 F.3d 454, 467 n.20 (5th Cir. 2008) ("juries are presumed to follow instructions") (citing <u>Zafiro v.</u> <u>United States</u>, 506 U.S. 534, 540-41 (1993)). If the jury did make this error, then, it clearly decided that Petitioner was nevertheless guilty of murder based on the correct definitions. Petitioner's knowledge of Mr. Lozano's intent, the most important mental state in the case, has nothing to do with either the "result of Petitioner's conduct" or the "nature of his conduct," because it has nothing to do with his conduct at all. The instructional error, whatever it was, played no role in the conviction, did not undermine the instructions as a whole, and did not infect the proceedings with any unfairness.

Petitioner has diligently gathered ample case law discussing jury charge errors that confuse "nature of conduct" offenses with "result of conduct" offenses. However, he has not cited any Texas or federal decisions finding such an error in a prosecution brought under the law of parties, the distinct legal context of his own trial. Independent review of precedent has likewise failed to reveal any such opinions. In light of that absence, the clear harmlessness of any error that occurred, the presence in the instructions of a legally valid theory to sustain the conviction, the presumed

correctness of the jury's verdict, the sufficiency of the evidence, and the state courts' reasonable findings, there are no grounds to grant habeas relief on the basis of anything contained in the jury instructions.

The only genuine definitional mistake at trial that Petitioner has pointed to arose not in the jury instructions, but in a remark made by the trial court during a conference with the attorneys. (D.E. 4-5, at 16). In that remark, the trial court purported to define knowing conduct, but mistakenly recited language from the definition of reckless conduct. (D.E. 22-24, at 31). Petitioner, like his cousin and co-defendant Mr. Gonzalez, has made much regarding this slip of the tongue or momentary confusion. See, e.g., (D.E. 4-2, at 28; D.E. 22-1, at 56). His concern is misplaced. The trial court's error was made out of the presence of the jury. It clearly played no role in influencing the instructions that were ultimately presented, as those instructions did not echo the mistake. Nor does it appear to have re-surfaced during the remainder of the proceedings.

Indeed, the confusion in question arose in a debate over the lesser included offense of manslaughter. After the trial court retired to re-consider the matter, Petitioner prevailed in that debate. Presumably, therefore, the judge consulted the proper definition, corrected her misunderstanding, and then ruled in Petitioner's favor. At the very least, the mistake had no adverse effect on his defense.[5]

Accordingly, it is respectfully recommended that the jury charges were proper and that Petitioner is not entitled to habeas relief on the ground that the criminal offenses with which he was

---

[5] In a similar statement that has caused Petitioner equal consternation, the trial judge noted that she could not "get off the fact of knowingly. I just can't get off of it. So I am going to deny, and if I am wrong on this, then the court of appeals is gonna tell me." (D.E. 22-24, at 33). In his view, these comments indicated that the trial court "expected" the court of appeals to vacate his conviction. (D.E. 22, at 92-93). As in several other instances, Petitioner confuses debate and deliberation with confusion and error, or perhaps with fatalism. Far from demonstrating the invalidity of his conviction, the fact that the attorneys and trial court wrestled with the difficult legal questions implicated by his case suggests that he was given a thorough and fair trial.

charged were misdefined at his trial.

**H.     The Burden Of Proof Was Not Improperly Shifted To Petitioner.**

Petitioner argues that the burden of proof was improperly shifted to him.  (D.E. 4-1, at 26).

Respondent asserts that his argument concerning the burden of proof "is really a challenge to the

sufficiency of the evidence" and further argues that the state court found no improper burden-shifting.

(D.E. 30, at 17).  In Petitioner's response, he again returns to his argument concerning the definition

of murder.  (D.E. 33, at 16).  However, he also clarifies that he believes the burden was shifted

because the instructions obligated him "to prove that Lozano, the person who fired the shots, didn't

even know that somebody was behind the door or in the apartment."  Id. at 19.  He complains that

the prosecution was not required to prove that he "was reasonably certain that Lozano was going to

pull out the pistol and shoot through the door."  Id. at 20.

Due process compels that every criminal prosecution prove each charged element beyond a

reasonable doubt.  In re Winship, 397 U.S. 358, 364 (1970).  Furthermore, a jury instruction that

"reduce[s] the level of proof necessary for the Government to carry its burden ... is plainly

inconsistent with the constitutionally rooted presumption of innocence."  Cool v. United States, 409

U.S. 100, 104 (1972).

At times, Petitioner's argument regarding the burden of proof appears to be a reiteration of

his attack on the allegedly flawed definition of murder.  See, e.g., (D.E. 4-2, at 22).  Such an

argument does not implicate the burden of proof, and is in addition groundless.  In his most recent

filing, Petitioner's formulation of the issue comes closer to invoking the burden of proof, as he now

essentially asserts that he was forced to prove his lack of culpable knowledge, when the prosecution

should have been required to affirmatively show that he did possess that knowledge.  (D.E. 33, at 19).

Although more aptly defined, Petitioner's claim still fails.  As an initial matter, the jury was instructed on the burden of proof throughout the trial, not only prior to deliberation in the form of the jury charges, but at several other junctures and by both parties as well as the court.  See, e.g., (D.E. 22-1, at 106; D.E. 22-21, at 19-20, 26-27).  More to the point, it was never suggested, let alone instructed, that Petitioner could be found guilty if he failed to demonstrate that he did not know of Mr. Lozano's murderous intent.  On the contrary, the jury instructions clearly directed the jurors that:

> if you find from the evidence beyond a reasonable doubt that ... Michael Lozano, did ... commit murder ... and that the defendant, Steven Perez ... knew of the intent, if any, of Michael Lozano to commit murder ... and the defendant ... acted with intent to promote or assist the commission of the offense ... by encouraging, directing, aiding, or attempting to aid Michael Lozano to commit the offense of murder ..., you will find the defendant ... guilty of murder as charged.

(D.E. 22-1, at 100).  This formulation is not only a correct application of the law of parties to Petitioner's case, it places the burden of proof squarely on the shoulders of the prosecution to prove that he acted with the requisite mens rea.  As Petitioner himself aptly and repeatedly notes, "juries are presumed to follow instructions."  Moore, 534 F.3d at 467 n.20 (citation omitted).

The only moment in the trial when a question regarding the burden of proof arose in earnest occurred during the debate over the lesser included offense of manslaughter.  It was then that defense counsel articulated the argument that Petitioner is lodging now: that the burden of proof regarding knowledge was being shifted to the defendant.  (D.E. 22-24, at 32).  However, that exchange has no bearing on his present claim.  For one thing, it occurred in a discussion of whether to omit a lesser included offense, not a discussion over Petitioner's guilt or innocence, a significantly different context.  More importantly, defense counsel won that argument and manslaughter made it into the jury charges as a lesser included offense.  Thus, whatever mistake potentially could have transpired

41

regarding the burden of proof was quickly remedied by the trial court's ultimate ruling.

Accordingly, it is respectfully recommended that the burden of proof at Petitioner's trial was properly placed on the prosecution.

**I.      Petitioner Received Effective Assistance Of Counsel.**

To prevail on a claim of ineffective assistance of counsel, a state prisoner seeking federal habeas corpus relief bears the burden of showing that: (1) counsel's performance was deficient, and (2) the deficient performance resulted in actual prejudice.  Strickland v. Washington, 466 U.S. 668, 687 (1984).  However, a reviewing court need not consider both prongs if the court concludes that petitioner has failed to prove either.  Id. at 697; Amos v. Scott, 61 F.3d 333, 348 (5th Cir. 1995) (citation omitted).

In order to show counsel's performance was deficient, petitioner must show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  Strickland, 466 U.S. at 687.  He must demonstrate that counsel's representation fell below an objective standard of reasonableness as measured by prevailing professional standards.  See Little v. Johnson, 162 F.3d 855, 860 (5th Cir. 1998) (citation omitted).

Counsel's challenged conduct should be evaluated from the perspective of counsel at the time the conduct occurred.  Strickland, 466 U.S. at 690.  Due to the difficulties inherent in engaging in this analysis without being tainted by "the distorting effects of hindsight," a court's review should be highly deferential to counsel.  Id. at 689.  The reviewing court must indulge in a strong presumption that counsel has exercised reasonable professional judgment.  Id. at 690.  The Supreme Court has recently reminded that "the standard for judging counsel's representation is a most deferential one" because "[u]nlike a later reviewing court, the attorney observed the relevant proceedings, knew of

materials outside the record, and interacted with the client, with opposing counsel, and with the judge." Harrington, __ U.S. __, 131 S. Ct. at 788.

The Fifth Circuit has explained that due to "the almost infinite variety of possible trial techniques and tactics available to counsel, this Circuit is careful not to second guess legitimate strategic choices." Yohey v. Collins, 985 F.2d 222, 228 (5th Cir. 1993).  In addition, "'[a] conscious and informed decision on trial tactics and strategy cannot be the basis for constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness.'" Johnson v. Dretke, 394 F.3d 332, 337 (5th Cir. 2004) (citations omitted).

Under the second prong of the Strickland two-part test, Petitioner may not simply allege, but must affirmatively prove, actual prejudice resulting from the ineffective assistance of counsel. Strickland, 466 U.S. at 693.  Thus, he must affirmatively show that his counsel's actions deprived him of a fair trial.  See Czere v. Butler, 833 F.2d 59, 64 (5th Cir. 1987).  Prejudice results when "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." Strickland, 466 U.S. at 694; see also Lockhart v. Fretwell, 506 U.S. 364, 372 (1993) (habeas petitioner must show that the trial result was unreliable, or the proceeding was fundamentally unfair due to counsel's deficient performance) (citations omitted). "The likelihood of a different result must be substantial, not just conceivable." Harrington, __ U.S. __, 131 S. Ct. at 792 (citation omitted).

Petitioner has the burden of proof under the Strickland test.  See Carter v. Johnson, 131 F.3d 452, 463 (5th Cir. 1997) (holding burden of proof is on petitioner in a federal habeas proceeding). In addition, the Supreme Court has recently reiterated that "[w]hether before, during, or after trial, when the Sixth Amendment applies, the formulation of the standard is the same: reasonable

competence in representing the accused." Premo v. Moore, __ U.S. __, 131 S. Ct. 733, 742 (2011) (emphases added) (citing Strickland, 466 U.S. at 688).

### 1.    Petitioner was not deprived of counsel at a critical pretrial proceeding.

Petitioner accuses the trial court of unconstitutionally depriving him of counsel during a pretrial habeas hearing.  He earlier claimed that a trial court clerk cancelled the hearing, but now claims that the Nueces County Sheriff's Department was responsible for the deprivation by keeping him unjustly in solitary confinement.  (D.E. 4-4, at 3; D.E. 33, at 31).  As the trial court noted long ago, and as Respondent reminds now, Petitioner could not have been deprived of counsel at a proceeding that he acknowledges did not occur.  (D.E. 30, at 18).  His latest rebuttal–shifting the blame for the canceled hearing to his jailers–fails to rectify this glaring deficiency in his logic.

Accordingly, it is respectfully recommended that Petitioner was not denied assistance of counsel at a critical pretrial proceeding.

### 2.    Petitioner received effective assistance from trial counsel.

In the ineffective assistance claim, Petitioner cites a number of actions that his trial counsel took or failed to take.  Specifically, he faults his counsel for neglecting to object to various pieces of inadmissible evidence, including his video confession, and the prosecution's misrepresentations of evidence and law.  (D.E. 1, at 12; D.E. 4-1, at 16).  Such failures, he contends, waived the issues for appellate review with "devastating" consequences.  (D.E. 4-1, at 16).  He also holds his attorney accountable for failing to preserve for appeal a challenge to the impartiality of a juror, who was a friend and co-worker of the victim's sister.  (D.E. 4-3, at 18).  Finally, he takes exception to his counsel's failure to prevent the admission of a telephone conversation, which informed the jury of his criminal record.  Id.  He attributes this failure to shoddy investigation and preparation.  Id.

44

Petitioner's claims regarding his trial counsel's performance fail, severally or jointly, to survive summary judgment.  Indeed, most of the actions complained of could hardly be called errors at all.  Trial counsel did in fact object to the incriminating statement given by Petitioner to law enforcement.  He challenged its admission on Fifth and Sixth Amendment grounds, both before and during trial.  (D.E. 22-20, at 21; D.E. 22-23, at 50).  On both occasions, defense counsel elaborated his grounds for the objections at length and sought to elicit testimony to substantiate the objection.  Id.  Indeed, he went further and attempted to make the argument directly to the jury even after his objection had been overruled.  (D.E. 22-23, at 55-56).

Surprisingly, the state appellate court appears to have overlooked the segment of the transcript in which trial counsel re-urged his pretrial objection, despite the fact that he did so only two lines below the statement that it quoted in finding the objection waived, and despite the fact that he explicitly did so in order not "to be in any waiver position ... with regard to" the statement.  Id. at 50; Perez, 2009 WL 1607811, at *6.  Nevertheless, trial counsel dutifully and ably made the objection and the issue should have been considered preserved.  Therefore, he did not commit any error with respect to the issue, let alone a prejudicial one.

Petitioner's other contentions regarding supposed failures to object are equally without merit.  As with the video statement, counsel did object to the playing of the recorded conversation, although he appeared to rely more upon improper impeachment grounds than on grounds of prejudice, relevance, prior criminal history, or hearsay.  (D.E. 22-23, at 24-25).  Petitioner correctly believes that these latter grounds would have been better objections, as counsel himself realized after hearing the recording.  Id. at 25, 29.  Nevertheless, this oversight does not remotely rise to the level of a Sixth Amendment violation.  For one thing, trial counsel did lodge the objections retrospectively and was

overruled, thus strongly suggesting that the trial court would have done the same had he made them preemptively. For another, it is impossible to imagine that the recording's contents were significantly prejudicial, given that the essential facts in the case were not in dispute. Indeed, a comparison of the recording with Petitioner's own statement to police suggests that the former was hardly the most damning piece of evidence in the record.

Finally, Petitioner misreads the transcript when he concludes that his counsel failed to object to the recording solely because he had been negligent and "'overlooked' getting a copy." (D.E. 1, at 12). In fact, the conversation between the attorneys suggested that there was confusion about the recording during discovery on both sides, and that the prosecution very well might have neglected to turn it over. Trial counsel's failure to object to the recording was therefore not an instance of ineffective assistance, but rather at most a momentary lapse in a long and complex case that caused no prejudice.

Likewise, Petitioner's accusations that his counsel failed to object to various alleged distortions and misrepresentations of law and fact put forth by the prosecution do not withstand scrutiny. His elaborate discussion notwithstanding, it is difficult to see how the supposedly flawed time-line presented by the prosecution during closing arguments posed a substantial enough risk to an acquittal in and of itself that it warranted an objection. Accepting arguendo that the time-line did in fact misstate the date of Mr. Asberry's interview with police, Petitioner does not make clear how such a misstatement might have swayed a previously undecided juror into voting guilty. Indeed, the decision to object to such an apparently trivial mistake on the part of the prosecution would itself have been a questionable strategic move on the part of trial counsel, given the unflattering light it might have cast on the defense. See United States v. Robinson, 502 F.2d 894, 897 (7th Cir. 1974)

46

("Competent defense counsel may well share the view that frequent and repeated objections ... serve only to alienate and antagonize the jury.").

Trial counsel's failure to elicit the potential juror conflict on voir dire was admittedly the result of insufficiently probing questioning. Even so, along with the other purported errors, it cannot be said to have played any role in Petitioner's conviction, particularly in light of the trial court's satisfaction with the juror's attestations of impartiality and the lack of any significant relationship between the juror and Ms. Perez. The formulation of voir dire queries is a strategic question and as such "cannot be the basis for a claim of ineffective assistance of counsel unless counsel's tactics are shown to be 'so ill chosen that it permeates the entire trial with obvious unfairness.'" Teague v. Scott, 60 F.3d 1167, 1172 (5th Cir. 1995) (citation omitted). Defense counsel's failure here, whatever it may have been, did not remotely rise to that level.

In addition to these main complaints, Petitioner's briefs are littered with numerous other alleged failures on the part of trial counsel. It is therefore worth noting as a general matter that a review of the transcript as a whole does not suggest any shortcomings in his diligence, preparation, or advocacy. On the contrary, trial counsel clearly devised a straightforward and sensible litigation strategy–placing the blame for the shooting on Mr. Lozano and arguing that his client did not intend for the victim to be harmed–and pursued that strategy forcefully and effectively. Most saliently, his cross-examinations were lengthy, detailed, and aggressive. Indeed, Petitioner himself concedes that his trial counsel "went through great lengths to preserve" the issue that he now deems most critical to his habeas claim, that the element of knowledge was distorted at his trial. (D.E. 4-3, at 9; D.E. 33, at 21). He did so with forcefulness and passion, butting heads with the prosecution and trial court at several junctures during the trial. His overall representation constituted nothing if not "active and

capable advocacy," thus making it "difficult to establish ineffective assistance." <u>Harrington</u>, __U.S.
__, 131 S. Ct. at 791 (citations omitted).

Accordingly, it is respectfully recommended that Petitioner's claim of ineffective assistance
of trial counsel should be dismissed.

### 3.      Petitioner received effective assistance from appellate counsel.

Petitioner submits that his appellate counsel was ineffective for failing to raise a number of
issues, including the burden of proof at his trial, the definition of murder in the jury charge, and
various incidents of prosecutorial misconduct. (D.E. 4-2, at 26; D.E. 33, at 9). In his view, had these
arguments been elaborated on direct appeal, his conviction would have been reversed. (D.E. 4-2, at
26).

The objective standard of reasonableness does not require appellate counsel "to 'raise every
nonfrivolous ground of appeal available.'" <u>United States v. Williamson</u>, 183 F.3d 458, 462 (5th Cir.
1999) (citation omitted). Rather, "a reasonable attorney has an obligation to research relevant facts
and law, or make an informed decision that certain avenues will not prove fruitful." <u>Id.</u> (citing
<u>Strickland</u>, 466 U.S. at 690-91). "Solid, meritorious arguments based on directly controlling
precedent should be discovered and brought to the court's attention." <u>Id.</u> at 463.

The claims Petitioner faults his appellate counsel for not making are meritless now, and were
meritless at the time. The burden of proof was not improperly shifted, the jury charges were sound,
and no prosecutorial misconduct took place. Appellate counsel had no reason to raise any of these
claims. If he had, there is no reason to share Petitioner's belief that his conviction would have been
overturned, especially in light of the appellate court's firm endorsement of the sufficiency of the
evidence, an issue that he acknowledges is intertwined with almost all of his other arguments.

48

Needless to say, appellate counsel <u>did</u> raise this claim, and allowed Petitioner to continue pursuing it in his habeas filings.  (D.E. 22-4, at 26).

Accordingly it is respectfully recommended that Petitioner's claim of ineffective assistance of appellate counsel be dismissed.

**J.      Petitioner's Double Jeopardy Claim Is Moot.**

Petitioner makes out a double jeopardy claim that his conviction cannot be lowered from murder to manslaughter, and that he cannot be retried for either.  (D.E. 1, at 16).  Respondent replies that Petitioner's double jeopardy claim is moot because he is not entitled to relief or a new trial. (D.E. 30, at 25).  Petitioner denies that his claim is moot, reiterating that he cannot be retried and urging the Court to bar the state from prosecuting him a second time.  (D.E. 33, at 34).  Because Petitioner is not entitled to habeas relief, he will not be retried and his double jeopardy claim is moot. See <u>Texas Midstream Gas Services, LLC v. City of Grand Prairie</u>, 608 F.3d 200, 205 (5th Cir. 2010) ("A claim is moot if 'the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome.'") (citation omitted).

Accordingly, it is respectfully recommended that Petitioner's double jeopardy claim should be dismissed as moot.

**K.      Several Of Petitioner's Claims Are Not Cognizable On Habeas Review.**

At least two of Petitioner's arguments are not suited for habeas relief pursuant to § 2254: his complaint that the Texas appellate court improperly reviewed his conviction by failing to consider his jury instructions and his claim that Respondent has violated his First Amendment rights.  (D.E. 1, at 16; D.E. 4-5, at 9; D.E. 33, at 12); <u>see</u> <u>also</u> <u>Harrington</u>, __ U.S. __, 131 S. Ct. at 784 (omissions of written state court opinions are irrelevant to federal habeas claim); <u>Jackson v. Cain</u>, 864 F.2d 1235,

49

1248-49 (5th Cir. 1989) (treating First Amendment access to court claim by prisoner under § 1983). Furthermore, to the extent that sense can be made of Petitioner's claim that the state courts have exerted improper jurisdiction over his federal case, that argument appears to be an attack on the execution of his sentence and is therefore inappropriate in a § 2254 petition. See Pack v. Yusuff, 218 F.3d 448, 451 (5th Cir. 2000) ("A section 2241 petition on behalf of a sentenced prisoner attacks the manner in which a sentence is carried out or the prison authorities' determination of its duration.") (citation omitted).

Accordingly, it is respectfully recommended that these claims should be dismissed without prejudice.

**L.      Petitioner Is Not Entitled To An Evidentiary Hearing.**

The Fifth Circuit has explained that "[a] hearing in a habeas proceeding is required *only* when, *inter alia*, the record reveals a genuine factual dispute." Tague v. Puckett, 874 F.2d 1013, 1015 (5th Cir. 1989) (emphasis added) (citation omitted); see also Murphy v. Johnson, 205 F.3d 809, 815-17 (5th Cir. 2000) (discussing basis for evidentiary hearing).

It is respectfully recommended that the record reveals no genuine factual dispute that would warrant an evidentiary hearing.

## V. CERTIFICATE OF APPEALABILITY

An appeal may not be taken to the Fifth Circuit from a final order in a habeas corpus proceeding "[u]nless a circuit justice or judge issues a certificate of appealability." 28 U.S.C. § 2253(c)(1)(A). Although Petitioner has not yet filed a notice of appeal, it is respectfully recommended that this Court nonetheless address whether he would be entitled to a certificate of appealability. A district court ruling on a petitioner's relief may sua sponte rule on a certificate of

appealability because it is "[a]rguably ... in the best position to determine whether the petitioner has made a substantial showing of a denial of a constitutional right on the issues before that court. Further briefing and argument on the very issues the court has just ruled on would be repetitious." Alexander v. Johnson, 211 F.3d 895, 898 (5th Cir. 2000) (per curiam).

The statute establishes that "[a] certificate of appealability may issue ... only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "The COA determination under § 2253(c) requires an overview of the claims in the habeas petition and a general assessment of their merits." Miller-El v. Cockrell, 537 U.S. 322, 336 (2003). To warrant a grant of the certificate as to claims denied on their merits, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Slack v. McDaniel, 529 U.S. 473, 484 (2000). This standard requires a § 2254 petitioner to demonstrate that "reasonable jurists could debate whether ... the [petition] should have been resolved in a different manner or that the issues presented ... deserve[d] encouragement to proceed further." United States v. Jones, 287 F.3d 325, 329 (5th Cir. 2002) (citation omitted).

As to claims district courts reject solely on procedural grounds, a petitioner must show both "that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." Slack, 529 U.S. at 484 (emphasis added).

It is respectfully recommended that reasonable jurists could not debate this denial on substantive or procedural grounds nor find that the issues presented are adequate to proceed. Miller-El, 537 U.S. at 327 (citing Slack, 529 U.S. at 484). Accordingly, it is respectfully recommended that the Court find that Petitioner is not entitled to a certificate of appealability.

51

## VI.  RECOMMENDATION

Based on the foregoing reasons, it is respectfully recommended that Respondent's motion for summary judgment, (D.E. 30), be granted on the merits, and this habeas petition, (D.E. 1), be dismissed.  It is further respectfully recommended that Petitioner be denied a certificate of appealability.

Respectfully submitted this 17th day of February 2011.


BRIAN  L. OWSLEY
UNITED STATES MAGISTRATE JUDGE

## <u>NOTICE TO PARTIES</u>

The Clerk will file this Memorandum and Recommendation and transmit a copy to each party or counsel.  Within **FOURTEEN (14) DAYS** after being served with a copy of the Memorandum and Recommendation, a party may file with the Clerk and serve on the United States Magistrate Judge and all parties, written objections, pursuant to 28 U.S.C. § 636(b)(1)(C); Rule 72(b) of the Federal Rules of Civil Procedure; Rule 8(b) of the Rules Governing § 2254 Cases; and Article IV, General Order No. 2002-13, United States District Court for the Southern District of Texas.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within FOURTEEN (14) DAYS after being served with a copy shall bar that party, except upon grounds of *plain error,* from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court.  <u>Douglass v. United Servs. Auto. Ass'n</u>, 79 F.3d 1415 (5th Cir. 1996) (en banc).